**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**TRACY STONER**                                                                    **PLAINTIFF**

**v.**                                    **Case No. 3:10-cv-00218 KGB**

**ARKANSAS DEPARTMENT OF
CORRECTION, et al.**                                                    **DEFENDANTS**

**OPINION AND ORDER**

Plaintiff Tracy Stoner brings this action against the Arkansas Department of Correction (the "ADC") under 42 U.S.C. § 2000e *et seq.* ("Title VII"), for gender discrimination, based on hostile work environment and disparate treatment, and retaliation; against Warden John Maples, in his individual and official capacities, under 42 U.S.C. § 1983 and the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq.* (the "ACRA"), for gender discrimination, based on disparate treatment, and retaliation; and against Correctional Medical Services, Inc. ("CMS"), under Title VII and the ACRA for gender discrimination, based on hostile work environment and disparate treatment, and retaliation.  The ADC and Warden Maples filed a motion for summary judgment (Dkt. No. 30).  CMS filed a separate motion for summary judgment (Dkt. No. 36).  Ms. Stoner filed a response to both (Dkt. Nos. 42, 45).  The ADC and Warden Maples (Dkt. No. 52), and CMS (Dkt. No. 53), filed a reply.  On June 27, 2013, defendants filed a supplemental brief (Dkt. No. 69), to which Ms. Stoner responded on June 28, 2013 (Dkt. No. 70).

For the reasons that follow, the ADC and Warden Maples's motion is granted in part and denied in part.  Summary judgment is granted as to Ms. Stoner's hostile work environment claims against the ADC and Warden Maples.  Those claims are hereby dismissed.  Summary judgment is denied as to Ms. Stoner's claims against the ADC and Warden Maples for gender discrimination based on disparate treatment and retaliation.  Those claims will proceed to trial.

CMS's summary judgment motion is granted in its entirety, and thus all of Ms. Stoner's claims against CMS are hereby dismissed.

## I.      Factual Background

The following facts are undisputed and taken from defendants' statements of undisputed facts (Dkt. Nos. 32, 38) and Ms. Stoner's responses to defendants' statements of undisputed facts (Dkt. Nos. 44, 47), unless otherwise specified by citation.

In November 2008, Ms. Stoner was hired as a Licensed Practical Nurse by CMS, now Corizon, Inc.  CMS contracts with the ADC to provide on-site medical services to ADC inmates at its 19 facilities throughout the state, including the Newport Complex.  The Newport Complex is the site of the McPherson Unit, where Ms. Stoner worked.  CMS contends that it controls the means by which nursing tasks are accomplished; interviews and hires nurses with no input from the ADC; supervises nurse duties; pays nurses and sets their work schedules; conducts nurse performance evaluations; and provides nurses with medical protocols and all "disposable" medical supplies necessary to care for inmates, except for X-ray machines and gurneys, which the ADC provides.  While employed, Ms. Stoner worked under the supervision of CMS Director of Nursing Janet Tiner, who worked under the supervision of CMS Health Services Administrator James Pratt.  Ms. Stoner maintains that she also received training from the ADC, was required to abide by all ADC rules, and, if she failed to do so, could be barred from the ADC facility by Warden Maples, effectively terminating her employment.  She also contends that Warden Maples indicated that he subjected CMS employees to the same standards as ADC employees.

Upon her hire, Ms. Stoner received a copy of CMS's Handbook.  She admits the CMS Handbook included a policy on "Institutional Action," which states that a CMS employee

normally will be terminated if the employee's access to a facility is revoked by the ADC because, without access to the facility, the CMS employee cannot get to work or perform any job duties.  She also admits the CMS Handbook contained provisions prohibiting sexual harassment, requiring that sexual harassment be reported, and addressing retaliation.   CMS's sexual harassment policy, with which Ms. Stoner was familiar, further emphasized that employees must report sexual harassment and also notified employees that falsification during an investigation was "strictly prohibited" and would result in disciplinary action.

Ms. Stoner also received a copy of the ADC's sexual harassment and reporting policies, which like CMS's policies state that sexual harassment will not be tolerated, requires an employee to notify a supervisor when she or he is being sexually harassed, and includes anti-retaliation language protecting individuals who report sexual harassment.  Further, the ADC provided Ms. Stoner with sexual harassment training that addressed what the ADC contends is a zero tolerance for sexually inappropriate conduct and the requirement to report such conduct. Ms. Stoner maintains that the ADC does not have a zero tolerance policy.

On June 4, 2009, Ms. Tiner was at the nurses' station when she overheard Ms. Stoner say, "I'm going to put a stop to this."  Ms. Tiner questioned Ms. Stoner about the comment, and Ms. Stoner said that corrections officer Eric Wellman had acted inappropriately toward her.  Ms. Stoner then told Ms. Tiner that she was going to handle the situation herself.

Ms. Tiner reported her conversation with Ms. Stoner to Mr. Pratt, who then reported it to ADC Major Linda Dixon.  Ms. Dixon instructed Mr. Pratt to obtain a written statement from Ms. Stoner.  Ms. Dixon then interviewed Mr. Wellman in her office and obtained a written statement from him.

Mr. Wellman first claimed that he had never touched Ms. Stoner "sexually," but admitted to having Ms. Stoner's cell phone number, claiming she gave it to him, and admitted to having called her.  The next day, after being placed on administrative leave, Mr. Wellman clarified that he had rubbed Ms. Stoner's shoulders but reported that Ms. Stoner did not indicate to him that she found it offensive.  Ms. Stoner maintains that Mr. Wellman was sexually harassing her, obtained her phone number through unknown means, and inappropriately and sexually touched her.  Ms. Stoner asserts that she did find it offensive and moved away from him.

Ms. Stoner drafted the following statement regarding the matter:

> On a Saturday in the month of March (not sure of date) I was in the pill room pulling up pills and Officer Wellman came to the pharmacy door wanting to talk with me.  I let him in the pharmacy.  I was standing on the left side of the room and Officer Wellman was leaning on the cabinet on the other side of the room. He started making sexual remarks to me like "I got something for you," "I need to come by and visit you at home," and things that made me feel uncomfortable.  I asked him about the ring on his finger and he said it didn't mean anything.  I told him it meant something to some woman.  As I started out of the pharmacy Officer Wellman came up behind me and ran his hands under my shirt at my waist.  I didn't really say anything but that he shouldn't do that.  He laughed and said you know you like it Ms. Stoner.  On May 30 around noon Officer Wellman came to medical stating he needed his blood pressure checked.  I checked his blood pressure and he asked how I had been.  I tried to hurry up and get back around into medical because I was feeling uncomfortable.  He followed me behind the desk and started massaging my shoulders.  Officer Ponder was present on this 2nd occurrence.

(Dkt. No. 44, ¶ 18).  In her deposition, Ms. Stoner alleged that during this time Mr. Wellman called her cell phone twice, though she did not answer, and stopped by her house once, leaving after he learned she was not there.

Surveillance camera footage was retrieved for the May 30 incident but purportedly was not available for the March incident.  According to Ms. Dixon, the May 30 footage showed that Officer Wellman walked into the nurses' station before Ms. Stoner and rubbed her shoulders for

approximately two to three minutes.  Ms. Tiner indicated that Ms. Stoner did not appear to enjoy or welcome the behavior.

On June 8, 2009, Ms. Stoner met with Mr. Pratt and defendant John Maples, who is the Warden of the ADC's Newport Complex.  Warden Maples claims to stress the agency's alleged zero tolerance for sexual harassment and the importance of reporting it, but he has never terminated anyone's employment for failure to report sexual harassment.  The parties agree that Warden Maples was concerned about Ms. Stoner's failure to report the incident and made his concern known to Ms. Stoner.  When asked by Warden Maples why she did not report Mr. Wellman's conduct until asked to do so, Ms. Stoner said she thought that she could take care of the situation herself.  The parties agree that Ms. Stoner's statements during this meeting regarding the March and May incidents were consistent with what was in her written statement.

Ms. Stoner contends that, during the June 8 meeting, Warden Maples told her in an intimidating manner that she was interfering with the livelihood of one of his officers and asked her if she was sure this is what she wanted to do.  Ms. Stoner maintains Warden Maples was angry based on tone, volume, and facial expression.  Ms. Stoner also alleges that Warden Maples claimed that Ms. Stoner filed the charge because her sexual preference was women (Dkt. No. 43, at 5).

Mr. Pratt described the meeting as "a straight-forward conversation of [Warden Maples] questioning [Ms. Stoner]," but testified that Warden Maples talked more about Ms. Stoner and her reporting obligations than Mr. Wellman's conduct and that Warden Maples told Ms. Stoner that she was putting people's livelihoods at stake, particularly Mr. Wellman's (Dkt. No. 44, ¶ 25).

Immediately after the June 8 meeting, Warden Maples barred Ms. Stoner from the Newport Complex, without having reviewed the surveillance footage. Mr. Pratt and Ms. Tiner did not agree with Warden Maples's decision, and both expressed their disagreement to Warden Maples. Mr. Pratt discussed the decision twice with Warden Maples, expressing his disagreement both times. When Ms. Tiner heard of Warden Maples's decision, she "got very angry." (Dkt. No. 47, ¶ 58). Because Ms. Stoner could not report to work, CMS placed her on leave with pay. Warden Maples claims that, at this time, he had only temporarily barred Ms. Stoner from the Newport Complex pending the outcome of the investigation. Ms. Stoner contends that alleged failure to report is not an offense that would lead to being barred from the Newport Complex and that Warden Maples admits this.

On June 12, 2009, Warden Maples issued a memo permanently barring Ms. Stoner from the Newport Complex. Warden Maples contends that he permanently barred Ms. Stoner because, after viewing the May 30 surveillance footage, he concluded that Ms. Stoner had falsified her statement. Specifically, Warden Maples claims that the footage showed that Ms. Stoner visited with Mr. Wellman "very non-chalant[ly]" for over two minutes after taking his blood pressure, "just laid back, just talking," and appearing very relaxed in his presence. Further, although Ms. Stoner reported that she "tried to hurry up and get back around into medical" and that Mr. Wellman "followed [her] behind the desk," the footage according to Warden Maples showed that Ms. Stoner first went down the corridor to visit another corrections officer and that Mr. Wellman walked behind the desk first (Dkt. No. 44, ¶¶ 28, 29). The ADC and Warden Maples contend that falsification is an extremely serious offense at the ADC and is a first-time terminable offense under ADC policy. Absent some mitigating circumstance, Warden Maples claims he always has terminated staff found to have falsified. Ms. Stoner disputes this.

Ms. Stoner counters that Ms. Tiner did not think the footage indicated Ms. Stoner welcomed the conduct.  She maintains that Warden Maples, Mr. Pratt, and Ms. Tiner all acknowledged that people have different reactions to harassment and that such a reaction may not include a strong verbal or physical opposition.  She also contends that Warden Maples admitted he could not say if Ms. Stoner "wanted it"; that the view of Ms. Stoner on the footage during the back rubbing was obstructed; and that it is understandable a person might forget the exact order in which she went from room to room.  Further, Ms. Stoner argues that her response to Mr. Wellman's conduct must be viewed with the understanding that she is a past victim of abuse.  On  June  19, 2009, after receiving Warden Maples's memo permanently barring Ms. Stoner from the Newport Complex, Mr. Pratt sent Ms. Stoner a letter discharging her pursuant to CMS's policies as stated in the CMS Handbook.  Mr. Pratt and Ms. Tiner were unhappy that they were forced to discharge Ms. Stoner due to her security clearance being revoked by Warden Maples.  Mr. Pratt informed Ms. Stoner in her termination letter that Ms. Stoner could apply for a job at another CMS facility, though there was no other CMS facility in the area, and could use Mr. Pratt and Ms. Tiner as a reference.  Following a disciplinary hearing held in accordance with ADC policy, Mr. Wellman also was terminated by the ADC for his inappropriate behavior.

On August 17, 2009, Ms. Stoner filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the ADC, alleging gender discrimination and retaliation and receiving a right-to-sue letter on June 15, 2010.  She filed this action on September 13, 2010.

## II.     Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant

is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56;  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010) (quoting *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999)) (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006))).  "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed."  *Id.*  Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III.     Overview Of Claims

####     A.     Claims Against The ADC

Ms. Stoner brings claims of Title VII gender discrimination, based on hostile work environment and disparate treatment, and retaliation against the ADC.  Title VII prohibits an "employer" from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of "sex," 42 U.S.C. § 2000e-2(a)(1), or from retaliating against an individual "because [she] has opposed any practice made an unlawful employment practice by [Title VII], or because [she] has made a charge under [Title VII]," *id.* § 2000e-3(a).  Accordingly, to begin, the Court must determine whether, under Title VII, the ADC was Ms. Stoner's "employer."

Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  *Id.* § 2000e(b).  To determine whether a defendant is a Title VII "employer," a "fact-intensive consideration of all aspects of the working relationship between the parties" must be employed.  *Hunt v. State of Mo., Dep't of Corr.*, 297 F.3d 735, 741 (8th Cir. 2002) (citations omitted) (internal quotation marks omitted). The Supreme Court and the Eighth Circuit have set forth the following 12 factors to consider:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Schwieger v. Farm Bureau Ins. Co. of N.E.*, 207 F.3d 480, 484 (2000) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992)). While the "primary consideration" is who has

the "right to control the manner and means by which tasks are accomplished," no single factor is decisive. *Hunt*, 297 F.3d at 741. Further, "the list of factors is nonexhaustive and the inquiry must take into account the 'economic realities' of the worker's situation," such as "how the work relationship may be terminated and whether the worker receives yearly leave." *Schwieger*, 207 F.3d at 484.

The ADC argues that application of the 12 factors shows it was not Ms. Stoner's "employer." In response, Ms. Stoner does not apply the 12 factors but instead argues that the ADC should be held liable under an "indirect theory of liability," as advanced in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973). The rationale of *Sibley*, as explained by the D.C. Circuit, is that:

> [c]ontrol over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on indivious grounds, access by any individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*Id.* at 1341. While the Eighth Circuit has not directly addressed the matter, it has stated that: "Title VII of the Civil Rights Act of 1964 is to be accorded a liberal construction in order to carry out the purposes of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination. Such liberal construction is also to be given to the definition of 'employer.'" *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977) (citing *Sibley*, 488 F.2d 1338) (other citations omitted). Further, district courts in the Eighth Circuit have followed the spirit of *Sibley* and *Baker*. *See Bone v. G4S Youth Servs., LLC*, 2010 WL 1980845, at *3

(E.D. Ark. May 14, 2010) (citing *Baker*, 560 F.2d at 391); *Trimble v. BNSF Ry. Co.*, 636 F. Supp. 2d 916, 924 (D. Neb. 2009) (holding that under Title VII "no direct employment relationship is required"); *Daud v. Golden Pump Poultry, Inc.*, 2007 WL 1621386, at *6 (D. Minn. May 11, 2007); *Dunn v. St. Louis Cnty.*, 1989 WL 35541, at *2 (E.D. Mo. Mar. 31, 1989) (unpublished).  This Court will do so as well.

Further, even when considering the 12 factors as outlined by the ADC, the Court determines the ADC may be considered Ms. Stoner's employer under Title VII.  The Court reaches this conclusion based on the facts in the record regarding the ADC's training of CMS employees on sexual harassment policies and reporting requirements, Warden Maples's view that he holds CMS employees accountable to the same standards as ADC employees, and Warden Maples's ability to ban a CMS employee from the Newport Complex, effectively terminating his or her employment.  These facts inform the Court's decision, given that no single factor is decisive and that "the inquiry must take into account the 'economic realities' of the worker's situation," such as "how the work relationship may be terminated . . . ."  *See Schwieger*, 207 F.3d at 484.

### B.    Claims Against Warden Maples

Ms. Stoner brings claims of gender discrimination, based on disparate treatment, and retaliation against Warden Maples, in his individual and official capacities, under § 1983 and the ACRA.  Ms. Stoner does not bring Title VII claims against Warden Maples, as an individual employee cannot be held personally liable under Title VII.  *See Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998).  In her response to the summary judgment motion, Ms. Stoner concedes that Warden Maples in his official capacity, like the ADC itself, is absolutely immune from suit under the ACRA (Dkt. No. 42, ¶ 3).

"To establish a violation of § 1983, the plaintiff must show the deprivation was (1) a right secured by the Constitution and laws of the United States, and (2) caused by a person or persons acting under the color of state law." *Tipler v. Douglas Cnty.*, 482 F.3d 1023, 1027 (8th Cir. 2007) (citing *Hicks v. St. Mary's Honor Ctr.*, 970 F.2d 487, 490-91 (8th Cir. 1992), *rev'd on other grounds*, 509 U.S. 502, 506 n.1 (1993); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Creason v. City of Wash.*, 435 F.3d 820, 823 (8th Cir. 2006)).  Likewise, "[t]he ACRA provides a cause of action for damages for 'the deprivation of any rights . . . secured by the Arkansas Constitution' by any person acting under color of state law," and "further provides that, in construing this section, 'a court may look for guidance to state and federal decisions interpreting . . . 42 U.S.C. § 1983.'" *Smith v. Insley's Inc.*, 499 F.3d 875, 882 (8th Cir. 2007) (quoting Ark. Code Ann. § 16-123-105).  As to the first requirement, Ms. Stoner's right to be free from gender discrimination is secured by the equal protection clause of the Fourteenth Amendment, *Tipler*, 482 F.3d at 1027 (citing *United States v. Virginia*, 518 U.S. 515, 532 (1996)), and Ms. Stoner's right to be free from retaliation based on protected speech is secured by the First Amendment, *see McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 865 (8th Cir. 2009).  As to the second requirement, "[p]rison authorities are clearly person[s] acting under color of state law." *Thomas v. Gunter*, 32 F.3d 1258, 1259 (8th Cir. 1994) (alteration in original) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)) (internal quotation marks omitted).  Thus, Ms. Stoner may bring her claims under § 1983 and the ACRA.

### C.    Claims Against CMS

Ms. Stoner brings claims of gender discrimination, based on hostile work environment and disparate treatment, and retaliation against CMS under Title VII and the ACRA.  She also claimed that CMS violated her free speech under the United States and Arkansas Constitutions

but now moves to dismiss voluntarily those claims.  Accordingly, Ms. Stoner's free speech claim against CMS is dismissed.

Ms. Stoner argues that CMS is liable for the ADC and Warden Maples's discriminatory and retaliatory actions toward her.  In support of this theory, Ms. Stoner points to cases finding that an employer may be liable for sexual harassment of an employee by a third party, *see Lockard v. Pizza Hut*, 162 F.3d 1062, 1073-74 (10th Cir. 1998); *Whitaker v. Carney*, 778 F.2d 216, 221 (5th Cir. 1985); *Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir. 1982), and a case where an employer was held liable for conditioning employment on submission to sexual demands of a client, *see Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 854 (1st Cir. 1982).  Like the circuits cited by Ms. Stoner, the Eighth Circuit appears to have held that, under certain circumstances, an employer may be liable for a hostile work environment created by a third party. *See Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111-12 (8th Cir. 1997) (finding that a home for developmentally-disabled patients could be liable for a hostile work environment created by a third party resident against an employee because the home "clearly controlled the environment in which [the third party resident] resided, and it had the ability to alter those conditions to a substantial degree").  Based solely on these cases, Ms. Stoner claims that it is reasonable to hold an employer responsible for a third party's alleged disparate treatment and retaliation.

However, this Court declines to extend Title VII employer liability to third party disparate treatment and retaliation, as Ms. Stoner only produces cases extending employer liability for third party sexual harassment.  Moreover, Ms. Stoner makes no arguments as to CMS's own discriminatory or retaliatory intent.  Instead, based on her theory of third party liability, Ms. Stoner's response to CMS's motion for summary judgment relies on her response

to the ADC and Warden Maples's motion for summary judgment to show "discriminatory intent, retaliatory intent, the hostility of the work environment, welcomeness of the conduct, and whether or not appropriate remedial action was taken" (Dkt. No. 46, at 2).  With this in mind, the Court will analyze Ms. Stoner's claims against CMS below.

IV.    **Gender Discrimination Claims**

A.    **Hostile Environment Claims Against The ADC And CMS**

Ms. Stoner brings Title VII hostile work environment claims against the ADC and CMS. To state a *prima facie* claim for hostile work environment harassment by non-supervisory co-workers, a plaintiff must establish: "(1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action."  *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999).  To state a claim of harassment by supervisors, only the first four factors are required. *See Anderson v. Family Dollar Stores of Ark.*, 579 F.3d 858, 862 (8th Cir. 2009).  To hold an employer liable for hostile work environment harassment by a third party, which appears to be possible under Eighth Circuit precedent, all five factors must be met, and the employer must have "clearly controlled the environment in which [the third party acted] and [have] had the ability to alter those conditions to a substantial degree." *See Crist*, 122 F.3d at 1111-12.

As to Ms. Stoner's hostile work environment claim against the ADC, it is unclear whether Ms. Stoner bases her claim solely on Mr. Wellman's alleged conduct or whether she claims that Warden Maples added to the hostile work environment.  The Supreme Court, in *National Railroad Passenger Corp. v. Morgan*, held that a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment

14

practice.' . . .   A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice."   536 U.S. 101, 117, 120 (2002).   Acts "*so similar in nature, frequency, and severity* . . . must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to th[e] action."   *Jenkins v. Mabus*, 646 F.3d 1023, 1027 (8th Cir. 2011) (alterations in original) (quoting *Wilkie v. Dep't of Health and Human Servs.*, 638 F.3d 944, 951 (8th Cir. 2011) (quoting *Rowe v. Hussman Corp.*, 381 F.3d 775, 779 (8th Cir. 2004))).   The Court finds that any alleged harassment by Warden Maples is not part of the same employment practice as the alleged harassment by Mr. Wellman and that the claims should be considered separately.   Here, the alleged conduct was committed by different actors—Mr. Wellman and Warden Maples—and the alleged harassment seems to have been motivated by different animus. *See Noviello v. City of Boston*, 398 F.3d 76, 87 (1st Cir. 2005) ("[A] claimant must show at a bare minimum a series of discriminatory acts that emanate from the same discriminatory animus."); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 790-91 (6th Cir. 2000); *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 69-70 (D.D.C. 2013).   Specifically, Mr. Wellman's alleged harassment was based on sex, while Warden Maples's alleged harassment was based on retaliation.   Gender discrimination and retaliation are made unlawful employment practices in separate sections of Title VII and appear to be distinct unlawful practices despite both being actionable as hostile work environment claims.   *See* 42 U.S.C. §§ 200e-2(a) (gender discrimination), 2000e-3(a) (retaliation).

For these reasons, the Court first analyzes Ms. Stoner's claim against the ADC based on Mr. Wellman's conduct under the non-supervisory standard and then her claim based on Warden Maples's conduct under the supervisor standard.   Further, Ms. Stoner does not allege that CMS's

own conduct created a hostile work environment but instead argues that CMS should be held liable for the conduct of Mr. Wellman and Warden Maples.  Because both Mr. Wellman and Warden Maples are third parties as to CMS, the Court analyzes Ms. Stoner's claim against CMS under the third party standard.

The ADC does not dispute that Ms. Stoner has shown the first three factors: she is a member of a protected group, the harassment was unwelcome, and there is a causal nexus between the harassment and her membership in the protected group.  Instead, the ADC focuses on the fourth and the fifth factors.

Regarding the fourth factor, "[h]arassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'"  *Ottman v. City of Independence*, 341 F.3d 751, 760 (8th Cir. 2003) (citing *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (2003))).  "To be actionable, harassment must be both objectively and subjectively offensive, such that a reasonable person would consider it to be hostile or abusive, and courts make this determination by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1158 (8th Cir. 1999) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal quotation marks omitted).  "[C]onduct must be extreme to amount to a change in the terms and conditions of employment."  *Ottman*, 341 F.3d at 760 (quoting *Faragher*, 524 U.S. at 788).  To prove a hostile work environment that violates Title VII, "[t]he plaintiff must show a practice or pattern of harassment against her or him; a single incident or

isolated incidents generally will not be sufficient.  The plaintiff must generally show that the harassment is sustained and nontrivial." *Moylan v. Maries Cnty.*, 792 F.2d 746, 749-50 (8th Cir. 1986).  The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks omitted); *see Harris*, 510 U.S. at 21; *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 962 n.3 (8th Cir. 1993).  Accordingly, once there is evidence of improper conduct and subjective offense, the determination of "[w]hether that conduct rose to the level of sexual harassment is usually a factual determination for the jury." *Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001); *see Howard*, 149 F.3d at 840.

As to Ms. Stoner's hostile work environment claim based on Mr. Wellman's conduct, Ms. Stoner alleges that, over a two-month period, the following events occurred: in March of 2009, Mr. Wellman told Ms. Stoner that "I got something for you," and "I need to come by and visit you at home"; Mr. Wellman put his hands under Ms. Stoner's shirt at her waist and said "you know you like it Ms. Stoner"; and Mr. Wellman called Ms. Stoner's cell phone twice, though she did not answer, and stopped by her house once, leaving after he learned she was not there; and Mr. Wellman rubbed Ms. Stoner's shoulders in May of 2009.  Warden Maples, Mr. Pratt, and Ms. Tiner all considered Mr. Wellman's conduct to be sexual harassment appropriate for Ms. Stoner to complain about.

The Court determines a reasonable juror could find that the frequency and severity of Mr. Wellman's conduct over a two-month period directed toward Ms. Stoner creates a hostile work environment.  *See Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888-89 (8th Cir. 1998) (finding a genuine issue of material fact regarding a hostile work environment where only five instances of

17

sexual harassment occurred in a period of several months); *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 908-10 (8th Cir. 2003) (finding ten instances of racial harassment in seven months sufficient to create hostile work environment).   Moreover, a reasonable juror could conclude that Mr. Wellman's conduct was physically threatening, as Ms. Stoner received unwanted phone calls and house visits, and that his conduct interfered with Ms. Stoner's work performance, as she endured unwanted physical contact at her work station.   *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68 (1986) (finding that voluntary submission to sexual conduct does not mean the conduct was welcome); *Bundy v. Jackson*, 641 F.2d 934, 946 (D.C. Cir. 1981) ("It may even be pointless to require the employee to prove that she 'resisted' the harassment at all. . . . She neither accepts nor rejects the advances; she simply endures them.")   For these reasons, the Court determines that the question of whether Mr. Wellman's conduct rose to the level of sexual harassment is a factual determination that should be left for the jury.   *See Moring*, 243 F.3d at 456.

To state a *prima facie* claim for hostile work environment harassment by a non-supervisory co-worker such as Mr. Wellman, Ms. Stoner also must establish that her employer knew or should have known of the harassment and failed to take prompt and effective remedial action.   The Court concludes that, as to this fifth factor, Ms. Stoner's *prima facie* claim based on Mr. Wellman's alleged conduct also fails.   "If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010).   "Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, the options available to the employer, . . . and whether or not the measures ended the harassment."   *Carter*, 173 F.3d at 702 (citations omitted).

The ADC contends it cannot be held liable because there is no evidence that it failed to take prompt and effective remedial action after learning of the allegations; instead, the ADC argues that the undisputed facts show that, as soon as it learned of the allegations, it conducted an investigation, placed Mr. Wellman on leave, and subsequently terminated him.  Ms. Stoner counters that the ADC failed to take prompt and effective remedial action because, before eventually dealing with Mr. Wellman, the ADC subjected her to further harassment by Warden Maples, who then barred her from the Newport Complex, effectively terminating her employment.  However, as discussed above, Warden Maples and Mr. Wellman's conduct are not part of the same actionable hostile work environment practice and must be considered separately.

Although the parties disagree as to the relevancy of Warden Maples's conduct, the parties do not dispute that, when Ms. Tiner heard Ms. Stoner's comments initially, she inquired of Ms. Stoner, reported the alleged harassment to Mr. Pratt, who in turn reported it to Major Dixon of the ADC.  The ADC then suspended Mr. Wellman pending the outcome of the investigation and eventually terminated his employment due to his conduct.  These acts by the ADC were "reasonably calculated to stop the harassment."  *Id.*  For these reasons, the Court grants the ADC summary judgment on Ms. Stoner's hostile work environment claim based on Mr. Wellman's alleged conduct.  Because the Court concludes the ADC cannot be held liable for hostile environment sexual harassment based on Mr. Wellman's alleged conduct, the Court also concludes that CMS cannot be held liable as a third-party for such alleged conduct and grants CMS summary judgment on this claim.

Considering Ms. Stoner's claim that Warden Maples created a hostile work environment, the Court determines Ms. Stoner does not satisfy the fourth factor.  Ms. Stoner argues that Warden Maples barred her from the facility after hearing her allegations, effectively firing her;

spent most of his time criticizing her for not immediately reporting the misconduct; and told her that she was going to cost one of his correctional officers his job and that she probably was saying this because she liked women better than men.   On the record before it and given controlling case law, the Court declines to find that these allegations involving Warden Maples, even if true, suffice as a matter of law to establish a *prima facie* claim of hostile environment sexual harassment.   *See Moylan*, 792 F.2d at 749-50 ("The plaintiff must show a practice or pattern of harassment," not "a single incident or isolated incidents.").   Because the Court concludes the ADC cannot be held liable for hostile environment sexual harassment based on Warden Maples's alleged conduct, the Court also concludes that CMS cannot be held liable as a third-party for such alleged conduct and grants CMS summary judgment on this claim.

### B.   Disparate Treatment Claims Against The ADC, Warden Maples, And CMS

Ms. Stoner brings a claim for gender discrimination based on disparate treatment against the ADC and CMS under Title VII, against Warden Maples under 42 U.S.C. § 1983, and against Warden Maples and CMS under the ACRA.   Section 1983 disparate treatment claims are analyzed under the same framework as Title VII disparate treatment claims.   *See Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992) (applying the same analysis to discrimination claims under Title VII, § 1981, § 1983; and the Age Discrimination in Employment Act); *Briggs v. Anderson*, 796 F.2d 1009, 1021 (8th Cir. 1986) (confining discussion of plaintiff's claims to Title VII after finding that "[t]he inquiry into intentional discrimination is essentially the same for individual actions brought under §§ 1981 and 1983"); *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 468 n.5 (8th Cir. 1984) ("The issue of discriminatory intent is common to analyses under the Fourteenth Amendment, § 1983, and Title

VII."). Likewise, disparate treatment claims under the ACRA are analyzed in the same manner as those brought under Title VII and § 1983. *See McCullough*, 559 F.3d at 860.

To begin, the ADC and Warden Maples argue that Ms. Stoner's disparate treatment claim should be dismissed because she asserts it for the first time in her response to the ADC and Warden Maples's motion for summary judgment. Ms. Stoner's complaint states that "[d]efendants [ADC] and CMS have violated Title VII of federal law by virtue of gender discrimination and retaliation for complaining of gender discrimination in the form of creating a hostile work environment, suspending her, and firing her" and "[d]efendant Maples has violated Plaintiff's rights to equal protection of the laws by virtue of his gender discrimination and retaliation for complaining of it" (Dkt. No. 1, at 3). In the complaint's factual allegations, Ms. Stoner sets forth a history of sexual harassment by Mr. Wellman, her complaints, and the conduct of Warden Maples that eventually led to her termination. The Court finds that these allegations sufficiently state a claim of gender discrimination based on disparate treatment and that such a claim is not being asserted for the first time here. Therefore, the Court will examine the claims.

Ms. Stoner can establish a *prima facie* claim of gender discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Bone*, 686 F.3d at 953. Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson*, 643 F.3d at 1043-44 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). "Thus, 'direct' refers to the causal strength of the proof, not whether it is

'circumstantial' evidence.   A plaintiff with strong direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, irrespective of whether her strong evidence is circumstantial." *Id.* at 1044.   However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, [s]he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.*

### 1.    Direct Evidence Analysis

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted).   "[N]ot every prejudiced remark made at work supports an inference of illegal employment discrimination." *Id.*   Rather, "[d]irect evidence of employment discrimination must have some connection to the employment relationship." *Id.*   Direct evidence of discrimination is not established by mere "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Id.* (quoting *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991)).

Ms. Stoner offers two statements allegedly made by Warden Maples as direct evidence of the ADC and Warden Maples's gender discrimination.   First, Warden Maples allegedly told Ms. Stoner that, by complaining of sexual harassment, she was interfering with Mr. Wellman's livelihood.   Second, Warden Maples allegedly said that Ms. Stoner was probably complaining

only because she liked women better than men. The ADC and Warden Maples argue that, even if said, Warden Maples's alleged statements only observe the impact of Ms. Stoner's accusations and question her motivation; they do not provide direct evidence that Warden Maples was biased against her gender. However, Ms. Stoner contends that Warden Maples admits that, if he made these comments, such conduct would evidence sexism (Dkt. No. 43, at 24).

This Court concludes that a reasonable juror could find the first statement, if made, reflects Warden Maples's alleged discriminatory attitude regarding women. *See Rivers-Frison*, 133 F.3d at 619. Specifically, Warden Maples's alleged focus on Mr. Wellman's livelihood could reflect a discriminatory attitude that stopping harassment of women is less important than a male correctional officer's livelihood. Warden Maples was a person involved in the decision making process and made the alleged statement in connection with the ADC and Ms. Stoner's employment relationship. *See id.* Accordingly, the Court determines that Warden Maples's first statement constitutes direct evidence, allowing Ms. Stoner's disparate treatment claim against the ADC and Warden Maples to survive summary judgment under a direct evidence analysis.

The Court is less convinced that Warden Maples's other alleged statement regarding Ms. Stoner's motivation could reflect a discriminatory attitude regarding women, although it might demonstrate an attitude that straight women would welcome Mr. Wellman's conduct. Moreover, in support of her claim, Ms. Stoner also asserts as direct evidence Warden Maples's suspension of Ms. Stoner, his analysis of the surveillance footage, and his treatment of alleged comparators. None of this shows a specific link between the alleged discriminatory animus and the challenged decision and, thus, is more appropriately considered in a *McDonnell Douglas* analysis.

Ms. Stoner has offered no direct evidence of CMS's gender discrimination.

### 2.     *McDonnell Douglas* **Analysis**

Under the *McDonnell Douglas* framework, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007).  To make out a *prima facie* case of gender discrimination, a plaintiff must show that she: "(1) is a member of a protected class; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) alleged facts that give rise to an inference of gender discrimination." *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 460-61 (8th Cir. 2010) (citing *McGinnis*, 496 F.3d at 874).  If a plaintiff makes out a *prima facie* case, she "creates a presumption of unlawful discrimination, rebuttable through the showing of a legitimate nondiscriminatory reason for the action." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 990 (8th Cir. 2011).  Lastly, a plaintiff "may still demonstrate the employer's proffered reason was pretextual and unlawful discrimination was a motivating factor in the adverse employment decision." *Id.*

Ms. Stoner has shown the first three factors, as she is a member of a protected class, was qualified for her job, and suffered an adverse employment action.  "[A] plaintiff can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (citing *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039-40 (8th Cir. 2010)).  The Eighth Circuit "has two lines of cases on the standard to determine whether employees are 'similarly situated' at the *prima facie* stage of the *McDonnell Douglas* test." *Id.* at 1019 (quoting *Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009)).  The first line of cases "sets a low threshold, requiring only that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* at 1019 (internal quotation marks omitted).  The other line of cases "more

rigorously requires that the employees be similarly situated in all respects." *Id.* (internal quotation marks omitted).

Ms. Stoner has made a *prima facie* case against the ADC and Warden Maples for gender discrimination under either line of cases. Ms. Stoner—who complained of sexual harassment and then was barred from the facility by Warden Maples, allegedly because of her dishonesty— offers seven comparators (Dkt. No. 43, at 12-13). Of the seven offered, at least two are similarly situated employees who are not in the protected class but allegedly received more favorable treatment than Ms. Stoner. Those two are male ADC employees who sexually harassed a woman and then lied about it, yet only received an oral reprimand. Ms. Stoner claims that their files reveal no justification for the lies that would merit not being fired, and ADC and Warden Maples offer no evidence to refute her claim. Considering as comparators only the two men who received an oral reprimand for lying, along with Warden Maples's allegedly biased comments discussed above under the direct evidence analysis, the Court concludes that Ms. Stoner has made a *prima facie* case of gender discrimination against the ADC and Warden Maples.

Because Ms. Stoner has established a *prima facie* case of discrimination against the ADC and Warden Maples, the burden shifts to the ADC and Warden Maples to show that there was a legitimate, nondiscriminatory reason for their adverse actions. "This burden is not onerous." *Bone*, 686 F.3d at 954. Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Id.* at 955 (internal quotation marks omitted). Defendants need only proffer a good-faith reason for their action. *Id.* The ADC and Warden Maples offer Ms. Stoner's dishonesty as a legitimate, nondiscriminatory reason for barring her from the Newport Complex.

Because the ADC and Warden Maples have articulated what appears to be a legitimate, nondiscriminatory reason to terminate Ms. Stoner, "the presumption of discrimination disappears," and the burden of persuasion shifts back to Ms. Stoner "to prove that the proffered justification is merely a pretext for discrimination." *Id.* (quoting *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005)). The Eighth Circuit has explained that "[t]here are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Torgerson*, 643 F.3d at 1047. First, "[a] plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* (alteration in original) (citations omitted) (internal quotation marks omitted).

Like a *prima facie* case, pretext can be shown where a plaintiff is treated worse than a similarly situated person not in the protected class. *See Wilmington v. J.I. Case Co.*, 793 F.2d 909, 916 (8th Cir. 1986). However, the Eighth Circuit has held that, "[a]t the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone*, 686 F.3d at 956 (internal quotation marks omitted). A plaintiff "must show that she and the employees outside of her protected group were similarly situated in all relevant respects." *Id.* (internal quotation marks omitted). The potential comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)). Further, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Id.* (alteration in original) (internal quotation marks omitted).

The two male ADC employees who sexually harassed a woman and then lied about it, yet only received an oral reprimand, are still similarly situated to Ms. Stoner under the pretext stage standard. All distinguishing circumstances are irrelevant, and the ADC and Warden Maples do not provide mitigating circumstances. One distinguishing circumstance is that the two men were accused of lying about their sexual harassment, while Ms. Stoner was accused of lying about her complaints of alleged sexual harassment. However, the two men's actions are either as serious as Ms. Stoner's alleged actions—merely lying—or are more serious—sexually harassing a co-worker and then lying—but they received more lenient treatment. Another distinguishing circumstance is that the two men were ADC employees under Warden Maples's direct control, whereas Ms. Stoner was a CMS employee who Warden Maples could only discipline by barring her from the Newport Complex. But barring Ms. Stoner effectively terminated her employment with CMS, and Warden Maples likely would have foresaw that result. In sum, Ms. Stoner and the two men are similarly situated because they: dealt with the same supervisor, Warden Maples; were subject to the same standards, ADC policies against dishonesty; and engaged in the same conduct, lying about sexual harassment, which, if anything, could be viewed as more serious on the part of the two men who were more leniently treated.

For these reasons, the Court determines that a reasonable juror could conclude, based on a review of the record evidence in the light most favorable to Ms. Stoner, that the ADC and Warden Maples's legitimate, nondiscriminatory reason of Ms. Stoner's dishonesty is merely a pretext for disparate treatment. These issues are for the jury to resolve. Ms. Stoner's claim of gender discrimination based on disparate treatment will continue to trial as against the ADC and Warden Maples.

The Court concludes, however, that Ms. Stoner has not made a *prima facie* case of CMS's gender discrimination.  Ms. Stoner has not alleged that CMS treated male nurses more favorably or alleged that CMS or CMS's decision makers made biased comments.  In fact, Ms. Stoner admitted in her deposition that CMS did not discriminate against her based on gender (Dkt. No. 37, at 11-12), and the parties agree that Mr. Pratt and Ms. Tiner immediately reported Ms. Stoner's complaints of sexual harassment to ADC employees and expressed disagreement to Warden Maples regarding his decision to bar Ms. Stoner.  Even so, Ms. Stoner argues that CMS should have elevated its disagreement to the "head of ADC, and to the governor."  However, Ms. Stoner provides no evidence that such an appeal procedure existed or that Warden Maples's decision could have been overturned; in fact, if it had existed or could have been overturned, Ms. Stoner likely would have made such an effort herself, but provides no evidence that she did so. Lastly, Ms. Stoner relies on her argument that CMS should be held liable for the ADC and Warden Maples's discriminatory conduct.  For the reasons explained above, the Court rejects that argument.   Under the record evidence presented here, the Court grants CMS summary judgment as to Ms. Stoner's disparate treatment gender discrimination claim.

## IV.    Retaliation Claims

### A.    Title VII Retaliation Claim Against The ADC

"To establish a *prima facie* case of retaliation [under Title VII], an employee has the initial burden of establishing retaliation by showing that (1) she engaged in protected conduct; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (citing *Pye*, 641 F.3d at 1021).   Unlike First Amendment retaliation claims, which require retaliation merely to be a substantial or motivating factor, "Title VII

retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."   *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013). "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."   *Id.* at 2533.

While unclear what framework should be applied to Title VII retaliation claims following the Supreme Court's decision in *Nassar* that "but-for" is the correct causation standard, this Court notes that at least two circuit courts have continued to apply the *McDonnell Douglas* framework to retaliation claims.   *See Bishop v. Ohio Dep't of Rehab. & Corr.,* 2013 WL 3388481, *7-12 (6th Cir. July 9, 2013) (unpublished); *Nicholson v. City of Clarksville*, 2013 WL 3746098, *11-13 (6th Cir. July 17, 2013) (unpublished); *Coleman v. Jason Pharm.*, 2013 WL 5203559, *1-2 (5th Cir. Sept. 17, 2013) (unpublished).  The Eighth Circuit has not yet ruled on the matter.  Regardless, the Court finds that Ms. Stoner has established a "but-for" causal link with or without the *McDonnell Douglas* framework.

Ms. Stoner claims that, during the June 8 meeting, Warden Maples told her in an intimidating manner that she was interfering with the livelihood of one of his officers and asked her if she was sure this is what she wanted to do.  Ms. Stoner maintains that Warden Maples was angry based on tone, volume, and facial expression.  Ms. Stoner also alleges that Warden Maples claimed that Ms. Stoner filed the charge because her sexual preference was women.  Mr. Pratt agreed that, during the meeting, Warden Maples talked more about Ms. Stoner and her reporting obligations than Mr. Wellman's conduct and that Warden Maples told Ms. Stoner that she was putting people's livelihoods at stake, particularly Mr. Wellman's.  After the June 8 meeting, Warden Maples barred Ms. Stoner from the Newport Complex immediately, without having

reviewed the surveillance footage first.  After viewing the footage, on June 12, 2009, Warden Maples issued a memo permanently barring Ms. Stoner from the Newport Complex.  Mr. Pratt and Ms. Tiner disagreed with Warden Maples's decision, and Ms. Tiner with his reasoning, and both expressed their disagreement to Warden Maples.  Viewing the record evidence in the light most favorable to Ms. Stoner, a reasonable juror could conclude that Warden Maples's desire to retaliate against Ms. Stoner for her complaint was the "but-for" cause of his decision to bar her from the Newport Complex.

Warden Maples offers two legitimate, nondiscriminatory reasons for barring Ms. Stoner. First, Warden Maples claims that, at the June 8 meeting, he only temporarily barred Ms. Stoner to facilitate a fair investigation.  However, a reasonable juror could conclude that this reason is pretext, as there is no evidence Warden Maples temporarily bars all employees who make a complaint or that it is ADC policy to do so, the record does not indicate a pronouncement by Warden Maples at the time that his act was "temporary," and, even if temporary, Ms. Stoner could have been withheld pay if CMS had decided to do so based on Warden Maples's decision. *See Torgerson*, 643 F.3d at 1047 (holding than plaintiff can prove pretext by showing that "employer's explanation is unworthy of credence . . . because it has no basis in fact" (alteration in original) (internal quotation marks omitted)).  Further, Ms. Stoner contends that alleged failure to report is not an offense that would lead to being barred from the Newport Complex, and that Warden Maples admits this.

Second, Warden Maples contends that he permanently barred Ms. Stoner on June 12 because, after viewing the May 30 surveillance footage, he concluded that Ms. Stoner had falsified her statement complaining of Mr. Wellman's conduct.  Based on evidence in the record, viewed in the light most favorable to Ms. Stoner, a reasonable juror could reject Warden

Maples's purportedly belated justification for barring Ms. Stoner from the Newport Complex as pretext. *See id.* Ms. Tiner did not agree with Warden Maples's conclusion as to Ms. Stoner's truthfulness. Warden Maples's conclusion regarding Ms. Stoner's alleged dishonesty based on his review of the surveillance footage differed from the conclusions drawn by others who viewed the footage. Additionally, based on the timing of events, a reasonable juror could find that Warden Maples drew his conclusion of Ms. Stoner's alleged dishonesty from the surveillance footage in an effort to justify his prior decision to bar Ms. Stoner.

Based on the record before the Court, viewed in the light most favorable to Ms. Stoner, the Court determines that Ms. Stoner has raised a disputed issue of material fact as to whether retaliation was a "but-for" cause of the adverse employment action against her. Accordingly, the ADC's motion for summary judgment is denied as to Ms. Stoner's Title VII retaliation claim.

## B. First Amendment And ACRA Retaliation Claims Against Warden Maples

To establish a *prima facie* case of retaliation under the First Amendment, a plaintiff must show that her conduct was constitutionally protected and the protected conduct was a substantial or motivating factor in the defendant's adverse action. *McCullough*, 559 F.3d at 865 (citing *Altonen v. City of Minneapolis*, 487 F.3d 554, 559 (8th Cir. 2007); *Cox v. Dardanelle Pub. Sch. Dist.*, 790 F.2d 668, 672-76 (8th Cir. 1986)); *see Mooney v. Lafayette Cnty. Sch. Dist.*, 2013 WL 4018662, at *4 n.4 (5th Cir. Aug. 8, 2013) (unpublished) ("The holding in *Nassar* . . . does not apply to the First Amendment causation standard, which requires only that protected speech be a "substantial" or "motivating" factor in the adverse employment action suffered by plaintiff."). If plaintiff makes out a *prima facie* case, the burden shifts to defendant to show that it would have taken the same action regardless of plaintiff's protected speech. *McCullough*, 559 F.3d at 865 (citing *Altonen*, 487 F.3d at 559); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S.

274, 287 (1977).  ACRA claims undergo the same analysis because the free speech protections of the Arkansas Constitution are no more generous than those of the First Amendment.  *See McCullough*, 559 F.3d at 865.

Because complaining about conduct that one reasonably believes to constitute harassment is protected activity, *see Logan v. Liberty Healthcare Corp.,* 416 F.3d 877, 881 n.3 (8th Cir. 2005) (quoting *Peterson v. Scott Cnty.,* 406 F.3d 515, 525 n.3 (8th Cir. 2005)), Ms. Stoner need only show that her complaints of sexual harassment were a substantial or motivating factor in her termination.  "A substantial or motivating factor can be proven through either direct or indirect evidence."  *Wagner v. Jones*, 664 F.3d 259, 271 (8th Cir. 2011) (citing *Davison v. City of Minneapolis*, 490 F.3d 648, 655 n.5 (8th Cir. 2007)).  "A plaintiff need only prove that the employer's discriminatory motive played a *part* in the adverse employment action." *Id.* (citing *Davison*, 490 F.3d at 657).  Ms. Stoner's claims survive summary judgment under either a direct evidence or *McDonell Douglas* analysis.

As direct evidence of retaliation, Ms. Stoner again offers the two statements made by Warden Maples—first, that Ms. Stoner's complaint would cost one of his male employees his livelihood and, second, that she probably complained because she preferred women over men. The first statement is direct evidence of retaliation, as it reflects a discriminatory attitude on the part of Warden Maples that stopping sexual harassment is less important than his male employee's job.  A reasonable juror could infer that this discriminatory attitude was more likely than not a motivating factor in Warden Maples's decision to bar Ms. Stoner from the Newport Complex.  *See Rivers-Frison*, 133 F.3d at 619 ("To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude

sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision."). The Court is less convinced that Warden Maples's second alleged statement regarding Ms. Stoner's motivation reflects a discriminatory attitude regarding women, although the statement, if made, may be offensive for other reasons.

Turning to a *McDonnell Douglas* analysis, Ms. Stoner has established a temporal connection between her protected activity and the adverse action. After complaining about sexual harassment, Ms. Stoner alleges that she was immediately subjected to negative, sexist comments and barred from the Newport Complex. Defendants maintain Ms. Stoner was temporarily barred from the Newport Complex and then permanently barred eight days later. While this time interval is sufficient to establish an inference of causation, *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833 (8th Cir. 2002) (holding two-week interval to be sufficient), more than a temporal connection is generally required to present a genuine issue of material fact on a retaliation issue*, see, e.g.*, *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999), *cert. denied*, 528 U.S. 818 (1999). Here, in addition to the temporal connection Ms. Stoner has provided the alleged statements of Warden Maples and the comparators. As discussed above, two of the comparators she identifies are male employees who were accused of lying about their sexual harassment but were not barred from the ADC complex or terminated. This evidence is sufficient to get to the jury on her claim of retaliation because Ms. Stoner, also accused of dishonesty but in the context of reporting sexual harassment not purportedly committing it, was barred from the Newport Complex and effectively terminated. The Court finds that, based on this evidence, Ms. Stoner has established a *prima facie* case that her protected conduct, making a sexual harassment complaint, was a substantial or motivating factor in the Warden Maples's adverse action.

Because Ms. Stoner has established a *prima facie* case of retaliation against Warden Maples, the burden shifts to Warden Maples to show that there was a legitimate, nondiscriminatory reason for his adverse actions.  Again, Warden Maples offers Ms. Stoner's alleged dishonesty as a legitimate, non-discriminatory reason to bar her from the complex.  In response, Ms. Stoner cites three cases allegedly holding that summary judgment for an employer is inappropriate where an employer's legitimate, non-discriminatory reason for discharging an employee is related to the employee's protected activity.  *See Gilooly v. Mo. Dep't of Health and Senior Servs.*, 421 F.3d 734 (8th Cir. 2005); *Womack v. Munson*, 619 F.2d 1292 (8th Cir. 1980); *Pye*, 641 F.3d 1011.  In *Gilooly*, the case most on point, the employee investigating allegations of sexual harassment determined based on witness interviews that plaintiff had lied, and this was the reason given for plaintiff's termination.  421 F.3d at 740.  The evidence showed that rather than being caught in a clear, unequivocal lie, the investigator merely found plaintiff to be less credible than the other witnesses.  *Id.*  The Eighth Circuit held that the investigator's belief that plaintiff had lied could not be a basis for summary judgment, as the legitimacy of the investigator's belief was for a jury to decide.  *Id.*  The court further explained that:

> The reasons for the firing must be sufficiently independent from the filing of the complaint to constitute legitimate and nonretaliatory reasons for discharge. [*Womack*, 619 F.2d at 1297.]  Further, questions related to the very substance of the investigation are not sufficiently independent and therefore, within the scope of the protected activity.  *Id.*  Specifically, an investigator's independent determination of truth or falsity of [the plaintiff's] allegation . . . [can] not legally be grounds for discharge. *Id.* at 1298.  However, if false statements are not part of the protected activity, then they can be legitimate reasons for termination.

*Gilooly*, 421 F.3d at 740 (alterations in original) (internal quotation marks omitted).  An investigator's belief in dishonesty can only be a legitimate, non-discriminatory reason where the belief is not genuinely disputed because it is confirmed by "independently verifiable

evidence" creating a "clearer record of deception" that was detailed as the basis for the belief. *Id.* at 740-41.

Warden Maples argues that *Gilooly* is distinguishable here because there is "independently verifiable evidence" creating a "clearer record of deception" (Dkt. No. 52, at 11). Presumably, Warden Maples means the surveillance footage. Warden Maples claims that the surveillance footage shows Ms. Stoner acting "very non-chalant[ly]" for over two minutes after taking Mr. Wellman's blood pressure, "just laid back, just talking," and appearing very relaxed in his presence. Further, although Ms. Stoner reported that she "tried to hurry up and get back around into medical" and that Mr. Wellman "followed [her] behind the desk," according to Warden Maples, the footage showed that Ms. Stoner first went down the corridor to visit with another corrections officer and that Mr. Wellman walked behind the desk first. Lastly, Warden Maples points to *Richey v. City of Independence* and *EEOC v. Total System Services, Inc.*, to argue that "an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action." *Richey*, 540 F.3d 779, 784 (8th Cir. 2008); *see EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) ("[W]e cannot agree that an employer must be forced to prove—presumably in a court of law—more than its good faith belief that a false statement was knowingly made." An employer is "entitled to rely on its good faith belief about falsity, concealment, and so forth.").

The Court determines that the surveillance footage has not created a clear record of deception and no independently verifiable evidence confirms Warden Maples's purportedly good faith belief that Ms. Stoner was dishonest. Ms. Tiner did not think the footage indicated Ms. Stoner welcomed the conduct. Warden Maples, Mr. Pratt, and Ms. Tiner acknowledged that people have different reactions to harassment that may not include a strong verbal or physical

opposition to the alleged harassment.  In fact, Warden Maples admitted he could not say if Ms. Stoner welcomed Mr. Wellman's conduct.  Further, a person might reasonably forget the exact order in which she went from room to room, especially when recounting events months later; failing to remember does not make Ms. Stoner dishonest.  Lastly, in *Richey*, the Eighth Circuit went on to explain that an employer's belief of misconduct is only a legitimate, non-discriminatory reason for adverse action where the belief is in good faith.  540 F.3d at 784. *Richey* and *Total System Services, Inc.*, do not apply here because the good faith of Warden Maples's belief is genuinely disputed; under such circumstances, *Gilooly* controls.  For these reasons, the legitimacy of Warden Maples's belief that Ms. Stoner was dishonest is a question for the jury.

Lastly, Warden Maples seems to argue that he would have taken the same action regardless of Ms. Stoner's protected conduct.  *See Mt. Healthy City School Dist. Bd. of Education*, 429 U.S. at 287.  Specifically, Warden Maples argues that he has not retaliated against five other employees who complained of sexual harassment both before and after Ms. Stoner was barred from the Newport Complex and filed litigation, and that falsification is an extremely serious, first-time terminable offense under ADC policy.  However, there are disputed issues of fact surrounding both arguments that preclude the Court from granting summary judgment on this basis.  First, in his meeting with Ms. Stoner, Warden Maples emphasized that Mr. Wellman had a family and that her complaint would jeopardize his livelihood.  There is no evidence that any of the employees who made complaints and were not retaliated against had complained of harassers who had families.  Further, three of the five examples occurred after Ms. Stoner was barred from the Newport Complex and filed litigation against the ADC and Warden Maples.  Though not irrelevant, post-litigation conduct has little probative value since it is

necessarily taken with the litigation in mind. *Craik*, 731 F.2d at 477-78. Warden Maples's argument that falsification is a first-time terminable offense, and thus he would have taken the same action regardless of Ms. Stoner's protected conduct, is also unconvincing because Ms. Stoner has provided evidence of comparators who were accused of dishonesty but were not barred or terminated, as discussed above.

For these reasons, the Court denies Warden Maples's motion for summary judgment regarding Ms. Stoner's First Amendment and ACRA retaliation claims against him. Those claims will proceed to trial.

C.     <strong>Title VII And ACRA Retaliation Claims Against CMS</strong>

The Court concludes that Ms. Stoner has not established a *prima facie* case of CMS's retaliation under Title VII's "but-for" or the ACRA's "substantial or motivating factor" analyses. Again, Ms. Stoner does not provide any evidence of CMS's retaliation but instead relies on her argument that CMS should be held liable for the ADC and Warden Maples's retaliation—an argument that the Court rejects, as discussed above. It is undisputed that Warden Maples barred Ms. Stoner from the Newport Complex and that Ms. Stoner could not perform her job duties without access to the facility in which she worked. Moreover, it is undisputed that CMS terminated Ms. Stoner because she was barred from the Newport Complex and could not perform her job duties, not to retaliate against her for her claims against Mr. Wellman (Dkt. No. 53, at 11). Accordingly, the Court grants CMS summary judgment as to Ms. Stoner's Title VII and ACRA retaliation claims.

V.     <strong>Qualified Immunity</strong>

A government official sued in his individual capacity may raise the defense of qualified immunity. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

37

constitutional rights of which a reasonable person would have known." *Stepnes v. Ritschel*, 663 F.3d 952, 960 (8th Cir. 2011) (internal quotation marks omitted).  To determine if a qualified immunity defense applies, the Court must conduct a two-prong inquiry by examining: "(1) whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right and (2) whether the constitutional right violated was clearly established at the time of defendant's alleged misconduct." *Id.* (alteration in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)) (internal quotation marks omitted).  "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

First, as discussed above, the facts alleged, when taken as true and viewed in the light most favorable to Ms. Stoner, show that Warden Maples violated her Fourteenth Amendment right to be from gender discrimination based on disparate treatment and her First Amendment right to be free from retaliation.  Second, "[t]he right to be free of gender discrimination is clearly established," *Wright v. Rolette Cnty.*, 417 F.3d 879, 886 (8th Cir. 2005) (quoting *Peterson*, 406 F.3d at 524, as well as the "right to exercise First Amendment freedoms 'without facing retaliation from government officials,'" *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quoting *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)).  Because the answer to both prongs of the qualified immunity analysis is yes, Warden Maples is not entitled to qualified immunity.  *See Krout*, 583 F.3d at 564.

## VI.   Statutory Immunity

Warden Maples argues that he has statutory immunity from liability in his individual capacity pursuant to Ark. Code Ann. § 19-10-305(a).  That section provides: "[o]fficers and employees of the State of Arkansas are immune from liability and from suit, except to the extent

that they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment." Ark. Code Ann. 19-10-305(a).  It appears that ADC employees are not covered by liability insurance, so the question is whether Warden Maples's acts toward Ms. Stoner were malicious.

The Arkansas Supreme Court has recognized that the immunity provided by § 19-10-305 is similar to that provided by the Supreme Court for federal civil-rights claims.  *Smith v. Brt*, 211 S.W.3d 485 (Ark. 2005); *Fegars v. Norris*, 89 S.W.3d 919 (2002).  More rigorously, however, § 19-10-305(a) only provides state employees with statutory immunity for non-malicious acts.  In defining malice, the Arkansas Supreme Court has stated:

> It is true that in law malice is not necessarily personal hate.  It is rather an intent and disposition to do a wrongful act greatly injurious to another.  Malice is also defined as the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent. . . .  A conscious violation of the law . . . which operates to the prejudice of another person.  A condition of the mind showing a heart . . . fatally bent on mischief.

*Simons v. Marshall*, 255 S.W.3d 838, 842–43 (Ark. 2007) (alterations in original) (internal citations and quotation marks omitted).  Further, a plaintiff attempting to demonstrate malice must allege more than "willful and wanton conduct." *Id.*

Viewing the facts in the light most favorable to Ms. Stoner, the Court finds that she has created a disputed issue of fact as to whether Warden Maples acted maliciously.  Ms. Stoner argues that Warden Maples has admitted sexual harassment violates the law and ADC policy, that it would be reasonable for Ms. Stoner to expect not to be retaliated against for giving a statement regarding sexual harassment, and that it would be wrong to retaliate against her for doing so.  Further, Ms. Stoner argues that, although Warden Maples claims to have had a good

faith belief that Ms. Stoner engaged in some wrongdoing, there is evidence otherwise indicating retaliatory and discriminatory intent, as discussed above.

* * *

In summary, Ms. Stoner's claims of the ADC and Warden Maples's gender discrimination based on disparate treatment and retaliation will proceed to trial. Summary judgment is granted as to Ms. Stoner's hostile work environment claims against the ADC and Warden Maples, and all claims against CMS. Those claims are hereby dismissed.

_____
KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE